UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---------------------------------------------------------------------- x
WTC CAPTIVE INSURANCE COMPANY, INC.,

                    Plaintiff,

    -against-

LIBERTY MUTUAL FIRE INSURANCE COMPANY;
CERTAIN UNDERWRITERS AT LLOYD'S, AND
CERTAIN LONDON MARKET INSURANCE
COMPANIES; ASSICURAZIONI GENERALI S.P.A.;
and GENERAL SECURITY INDEMNITY COMPANY
OF ARIZONA, as attorney in fact for and successor in
interest to GENERAL SECURITY INDEMNITY
COMPANY (now known as HUDSON SPECIALTY
INSURANCE COMPANY),

                    Defendants.

---------------------------------------------------------------------- x

**OPINION DECLARING INSURERS' DUTY TO DEFEND**

07 Civ. 1209 (AKH)

ALVIN K. HELLERSTEIN, U.S.D.J.:

        The parties to this lawsuit—the City's insurance carriers of the 9/11 clean-up work—are engaged in a second phase of their dispute: which carriers, if any, and in which order, are required to defend the City and its contractors against the lawsuits of those who performed the clean-up work and claim they were injured because they were not provided with a safe work place or proper safety equipment. By my decisions of December 14, 2007 and March 19, 2008, I held that I have jurisdiction to hear the dispute. WTC Captive Ins. Co. v. Liberty Mut. Fire Ins. Co., -- F. Supp. 2d --, No. 07 Civ. 1209 (AKH), 2008 WL 748405 (S.D.N.Y. Mar. 19, 2008).

        WTC Captive Insurance Company, Inc. ("WTC Captive"), a not-for-profit captive insurance company funded by a grant from the Federal Emergency Management Agency, is the plaintiff. It sues for a declaration that two syndicates of Lloyd's underwriters—defendants Certain Underwriters at Lloyd's, London, Certain London

1

Market Insurance Companies, Assicurazioni Generali S.p.A., and General Security Indemnity Company of Arizona (collectively the "Excess Insurers" or "London Insurers")—owe a duty to defend the City and its contractors against the suits of the clean-up workers, approximately 10,000 in number. WTC Captive also seeks equitable contribution and reimbursement for having assumed the defense obligations when the Lloyd's underwriters failed and refused to do so.

The London Insurers had issued their policies to the City following the September 11 attacks. They claim in the lawsuit brought by WTC Captive that they have no obligation to pay, either for defense or for ultimate liability costs, under the terms of their policies.

The parties moved and cross-moved for summary judgment on the issue of the insurers' obligation to defend the City and its contractors. I decided in favor of WTC Captive at the conclusion of oral argument, on March 19, 2008. On March 21, 2008, I issued a summary order granting WTC Captive's partial motion for summary judgment and denying defendants' cross-motion for summary judgment. I write now to provide a fuller explanation of my rulings.

## The City's Insurance Program

In the wake of the September 11 attacks on the World Trade Center, and in connection with the massive job that lay ahead to clear the debris of the attacks, the City sought and obtained insurance protection. Protection in the amount of $77 million was obtained, arranged in several layers.

Liberty Mutual Fire Insurance Company ("Liberty Mutual"), a Massachusetts company with its principal place of business in Boston, retroactively

engaged to be the primary carrier.[1] The policy provided $4 million aggregate coverage to "defend and indemnify the City and its contractors against claim of bodily injury, property damage, personal injury or advertising injury" occurring in connection with the World Trade Center clean-up effort, and covered the period from September 11, 2001 to December 31, 2002. The policy imposed a duty on Liberty Mutual to defend the insureds up to the indemnity limits of the policy. The policy was subject to a number of standard exclusions, including an exclusion for "bodily injury or property damage arising out of the actual, alleged or threatened discharge, dispersal, seepage, migration, release or escape of 'pollutants'".

The City contracted also for excess coverage in the London market, arranging the next $75 million layer of coverage with various syndicates at Lloyd's, joined by Assicurazioni Generali S.p.A., and General Security Indemnity Company of Arizona (collectively the "London Insurers" or the "Excess Insurers"). Two policies were obtained, the first, contracted for on October 5, 2001, for $50 million of coverage, and the second, contracted for on January 9, 2002, for $25 million of coverage. Like the primary coverage provided by Liberty, the excess coverage provided by the London Insurers undertook to "defend and indemnify the City and its contractors against claims of bodily injury, property damage, personal injury or advertising injury" arising from the clean-up efforts at the World Trade Center covering the period from September 11, 2001 to December 31, 2002. The policies covered the City against the expense of defending the claims and lawsuits brought against it, with the costs of such defense to be additional to, and not subtracted from, the City's liability and loss. The London Insurers' policy

---

[1] WTC Captive and Liberty Fire have settled their issues. See <u>Order Dismissing Defendant Liberty Mutual Fire Insurance Company</u>, dated January 4, 2008.

3

also contained various standard exclusions, including a pollution exclusion barring coverage for bodily injury, property damage or personal injury "arising out of the actual or threatened discharge, dispersal, seepage, migration, release or escape of pollutants anywhere in the world". The policy also contained exclusions for bodily injury, property damage or personal injury resulting from asbestos and for occurrences of which the insureds had knowledge or should have been aware prior to October 3, 2001. The London Insurers' liability arises upon the exhaustion of the Liberty Mutual policy, and in excess of the insured's retained limit of $250,000 per occurrence. The London policies provide, further, that the retained limit applies only to the insurance risk, the duty to pay, and not to the duty to defend. Thus, the policies assure that the City will not have to defend itself or its contractors during the period of retention, after Liberty Mutual's obligation to pay ends, and the London Insurers' obligations to pay begin. The London Insurers' duty to defend begins when that of Liberty Mutual ends, and continues until the policy limits of the London Insurers are exhausted.

Approximately two years after obtaining the Liberty Mutual and London Insurance policies, on December 3, 2004, the City obtained additional protection for itself and its contractors from the Federal Emergency Management Agency ("FEMA"). Funded by a grant from FEMA, the City formed a not-for-profit, captive insurance company—WTC Captive Insurance Company ("WTC Captive")—to protect the City and its contractors against loss, liability and expense that exceeded the City's existing insurance protection. The WTC Captive received approximately $1 billion in funds via a grant from FEMA to insure the City and its contractors and consultants against claims arising in connection with the World Trade Center clean-up effort.

The WTC Captive policy, like the Liberty Mutual and Lloyd's policies, provides for a duty to defend the insureds. The duty is to begin when the defense obligation of the underlying Liberty Mutual and Lloyd's policies are satisfied, and is to continue until its insurance limits (its duty to pay) is exhausted. The Liberty Mutual policy and both London Insurers' policies are listed as underlying policies in Schedule B of the WTC Captive policy. However, unlike those policies, the WTC Captive policy does not contain an exclusion clause for pollution-caused damages.

## **The Prior Proceedings**

Beginning in 2002 and continuing to the present, more than 10,000 of those who worked at the World Trade Center site have filed suits against the City and its contractors, alleging respiratory illness, various cancers, and other injuries, and claiming that the City and its contractors caused those injuries by failing to provide adequate protective equipment and otherwise assure the safety of their work place. The City and the Contractors made demand upon its insurance carriers to defend it in such suits, but only WTC Captive responded affirmatively, beginning in the fall of 2004. All the lawsuits are pending in this court, pursuant to the exclusive jurisdiction provisions of the Air Transportation Safety and System Stabilization Act, 49 U.S.C. § 40101, ("ATSSSA"), Section 408(b)(3), and were assigned to me. They are consolidated for coordinated pre-trial discovery. See The World Trade Center Disaster Site Litigation, 21 MC 100.

Beginning in October 2002, and at regular intervals thereafter, the City and its contractors provided notice to the London Insurers via Willis of New York, Inc. ("Willis"), the broker for the London Insurers and, as well, the placement broker for the

5

City in procuring the insurance, of the claims pending against them in connection with the World Trade Center clean-up effort, and made demand that the insurers provide for their defense. The London Insurers claim that they did not receive these early notices. The insurers ultimately disclaimed liability and any obligation to provide a defense. In consequence, WTC Captive advanced defense expenses and, in February 2006, gave notice to the London Insurers and demanded that they provide a defense and reimburse WTC Captive for the expenses WTC Captive had advanced.

Liberty Mutual and WTC Captive claim that the Liberty Mutual policy was exhausted as of June 5, 2006, upon payment of various covered claims. Two days later, on June 7, 2006, Liberty Mutual provided notice to the London Insurers that the limits of its policy had been exhausted, and provided documentation of the exhaustion of the policy.[2]

In their papers, the London Insurers claim in their motion that the first notice they received of the claims against the City and its contractors was in August 2006, from the WTC Captive. In October 2006, the London Insurers informed the WTC Captive by letter that they would not assume the defense of the insured because they were not given timely notice and because, upon the London Insurers' preliminary review of the demand, they believed that the claims would not be covered by the insurance policies. The London Insurers followed their October 2006 letter with a second letter in January 2007, disclaiming coverage and any duty to defend the insureds.

---

[2] The London Insurers do not contest receipt of notice from Liberty Mutual, but claim that the proof of exhaustion provided by Liberty Mutual was insufficient. At argument, I instructed WTC Captive to arrange for Liberty Mutual to provide further documentation of exhaustion to the London Insurers. I instructed the London Insurers to notify the Court if they encountered further issues with Liberty Mutual's proofs. Having not heard anything further on the issue from the parties, I assume that the issue has been resolved.

At argument, in apparent contrast to the assertions made in their briefs that they did not receive notice of the claims against the City and its contractors until August 2006, the London Insurers stated that they first received notice of the claims in January 2005 from Turner Casualty & Surety on behalf of Turner Construction Company. Beginning in December 2004, Turner began providing notice to Liberty Mutual and Willis, asking for confirmation of acceptance of coverage and provision of a defense and indemnification. In November and December 2006, the London Insurers requested further information from Turner and met with them on at least one occasion regarding its request that the London Insurers assume its defense. In March 2007, the London Insurers sent a letter to Turner indicating that it would likely disclaim coverage on a number of grounds, including (1) the London Insurers' inability to confirm that Turner was a named insured; (2) application of the known occurrence and pollution exclusions; and (3) the fact that the London Insurers' policies applied in excess to the other available insurance. In July 2007, the London insurers formally disclaimed any obligation to defend or indemnify Turner via letter.

On February 16, 2007, WTC Captive filed this lawsuit against the London Insurers, seeking a declaration that the London Insurers had a duty to defend the City and its contractors in the 21 MC 100 litigation, and damages – essentially, reimbursement of defense expenses advanced by WTC Captive. The London Insurers moved to dismiss, contending that this court lacked subject matter jurisdiction. On December 14, 2007, at oral argument, I denied the motion and held that the district court had supplemental jurisdiction pursuant to 28 U.S.C. § 1367. Summary Order, December 14, 2007. I set out my reasons in a written opinion denying the London Insurers' motion for

reconsideration. WTC Captive Ins. Co. v. Liberty Mut. Fire Ins. Co., -- F. Supp. 2d --, No. 07 Civ. 1209 (AKH), 2008 WL 748405 (S.D.N.Y. Mar. 19, 2008).

WTC Captive then challenged the London Insurers' disclaimer of both coverage and its duty to defend. On January 3, 2008, WTC Captive filed a motion for partial summary judgment, seeking judgment from this Court declaring that the London Insurers had breached their duty to defend, and asking this Court to grant judgment for the defense costs advanced by WTC Captive. The London Insurers cross-moved for summary judgment, seeking judgment dismissing the complaint and declaring that the London Insurers had no duty to defend or indemnify the City or its contractors due to a number of policy exclusions, most notably, the pollution exclusion.

I heard argument on March 19, 2008, and held for the plaintiff, WTC Captive. See Summary Order, dated March 21, 2008. I held (1) that defendants had an ongoing duty to defend the City and its contractors in the 21 MC 100 litigation; (2) that defendants' obligation commenced upon exhaustion of the Liberty Mutual underlying insurance policy and notice thereof; and (3) that the parties should settle the amount defendants owed to plaintiff pursuant to these rulings.[3] This opinion explains my rulings in greater detail.

---

[3] The London Insurers reserved rights to proceed against the Contractors' insurance following disclosure of their policies.

**Discussion**

I. <u>The London Insurers' Duty to Defend Is Triggered By the Claims in the 21 MC 100 Litigation.</u>

An insurer's duty to defend is "exceedingly broader" than the duty to indemnify. <u>Maryland Cas. Co. v. Cont'l Cas. Co.</u>, 332 F.3d 145, 160 (2d Cir. 2003). The duty to defend is triggered whenever the allegations within the "four corners" of the complaint potentially give rise to a covered claim. <u>Frontier Insulation Contractors, Inc. v. Merchants Mut. Ins. Co.</u>, 690 N.E.2d 866, 868 (N.Y. 1997). If any of the claims against the insured arguably arise from covered events, the duty to defend is triggered. <u>Id.</u> If the duty to defend is clear and unambiguous on the face of the policy, it will be enforced according to its terms. <u>IBM v. Liberty Mut. Ins. Co.</u>, 363 F.3d 137, 144 (2d Cir. 2004). Should any ambiguity appear in the insurer's duty to defend, it will be resolved in favor of the insured. <u>Id.</u> An insurer may be contractually bound to defend even if it is not ultimately required to pay, either because the insured is not legally liable or because the occurrence is outside the policy's coverage. Moreover, an insurer is required to defend an insured even if the claims against the insured are frivolous or meritless. <u>Servidone Constr. Corp. v. Sec. Ins. Co. of Hartford</u>, 64 N.Y.2d 419, 423-24 (N.Y. 1985).

The claims in the underlying 21 MC 100 litigation allege generally that the City and its contractors failed to provide a safe workplace for the many individuals who assisted in the rescue and clean-up effort in the months following the attacks of September 11. The Complaints allege that the City and its contractors knew that the conditions at the World Trade Center site were dangerous to the workers' health, but failed to share this information with the workers, or to take steps to otherwise safeguard

the workers against illness. The plaintiffs cite specifically the alleged failure of the City and its contractors to ensure that all workers (1) were provided undamaged, functioning personal protective equipment, (2) were trained to utilize properly such equipment, and (3) were monitored to ensure consistent usage of such equipment. The complaints allege violations of New York State labor and general municipal laws, common law negligence, and like causes of action.

The London Insurers' policies, negotiated after the events of September 11, were issued to defend and indemnify the City and its contractors against claims of bodily injury "arising out of the World Trade Center Emergency Clean-Up Project". The policies were issued for a broad purpose, and the claims brought by the plaintiffs in the 21 MC 100 litigation fall squarely within that purpose. Had the London Insurers wanted to avoid assuming costs of defense or indemnification for claims like those brought by the plaintiffs in the 21 MC 100 litigation, they easily could have adopted suitable language to exclude such cases: the London Insurers were in the unique position of underwriting a risk retroactively, after the event causing the insured loss had already occurred. I decline to release them from their obligation to defend and afford them a benefit for which they did not contract.

The Excess Insurers' duty to defend is explicitly stated in the text of the policy:

> II. Defense
>     A. We shall have the right and duty to defend any claim or suit seeking damages covered by the terms and conditions of this policy when:
>         1. The applicable limits of Insurance of the underlying policies listed in the Schedule of Underlying Insurance and the Limits of Insurance of any other underlying Insurance providing coverage to the Insured have been

10

       exhausted by payment of claims to which this policy
       applies; or
    2. Damages are sought for Bodily Injury . . . covered by
       this policy but not covered by any underlying insurance
       listed in the Schedule of Underlying Insurance or any
       other underlying insurance providing coverage to the
       Insured.
  B.  When we assume the defense of any claim or suit:
    1. We will defend any suit against the Insured seeking
       damages on account of Bodily Injury  . . . even if such
       suit is groundless, false or fraudulent, but we have the
       right to investigate, defend and settle the claim as we
       deem expedient.
  We will not defend any suit or claim after out applicable Limits
  of Insurance have been exhausted by payment of judgments or
  settlements.
  All expenses we incur in the defense of any suit or claim are in
  addition to our Limits of Insurance.

    I hold that this broad defense clause obligated the London Insurers to assume the defense of its insured from the time of exhaustion of the underlying Liberty Mutual policy through the present. As is clear from the law cited previously and the explicit terms of the policy, the duty to defend is broad, and the London Insurers duty has been triggered pursuant to the terms of the policy. As the London Insurers promised, "We will defend any suit against the Insured seeking damages on account of Bodily Injury . . . even if such suit is groundless, false or fraudulent . . . ."

II. <u>The Pollution Exclusion Clause Does Not Excuse the London Insurers' Duty To Defend.</u>

    The London Insurers contend that despite the admittedly broad duty to defend under New York law and under the terms of its policies, that duty is not triggered by the claims in the 21 MC 100 litigation because those claims fall within the pollution exclusion.

Policy exclusions must be strictly and narrowly construed, with any ambiguity being resolved in favor of the insured. Edwards v. Allstate Ins. Co., 792 N.Y.S.2d 504, 505 (N.Y. App. Div. 2005). The insurer has the burden of showing that the exclusion clearly and unmistakably applies to the claims. Fed. Ins. Co. v. 1030 Fifth Ave. Corp., 691 N.Y.S.2d 498, 499 (N.Y. App. Div. 1999). To be relieved of its duty to defend on the basis of a policy exclusion, the insurer bears a heavy burden of demonstrating that the allegations of the complaint cast the pleadings wholly within the exclusion, that the exclusion is subject to no other reasonable interpretation, and that there is no possible legal or factual basis upon which the insurer may eventually be required to indemnify the insured. Frontier Insulation Contractors Inc., 690 N.E.2d at 868-69.

The pollution exclusion in the London Insurers' policies reads:

> M. 1. Bodily injury, Property Damage or Personal Injury arising out of the actual or threatened discharge, dispersal, seepage, migration, release or escape of pollutants anywhere in the world;
> 2. Any loss, cost or expense arising out of any governmental direction or request that we, the Insured or any other person or organization test for, monitor, clean-up, remove, contain, treat, detoxify, neutralize or assess the effects of pollutants, or
> 3. Any loss, cost or expense, including but not limited to costs of investigation or attorneys' fees, incurred by a governmental unit or any other person or organization to test for, monitor, clean-up, remove, contain, treat, detoxify or neutralize pollutants.
> This exclusion M. shall not apply to Bodily Injury, Property Damage or Personal Injury arising out of:
>   1. Heat, smoke or fumes from a hostile fire;
>   2. The upset, overturn or collision of a motor vehicle; or
>   3. The Products-Completed Operations Hazard;
> if insurance for such Bodily Injury, Property Damage or Personal Injury is provided by a policy listed in the Schedule of Underlying Insurance. However, the insurance provided by our policy for such Bodily Injury, Property Damage or Personal Injury will not be broader than the insurance coverage provided by the policy listed in the Schedule for Underlying insurance.

> As used in this exclusion:
> 1.   Pollutants means any solid, liquid, gaseous or thermal irritant or contaminant, including smoke, vapour, soot, fumes, acids, alkalis, chemicals and waste material. Waste material includes materials which are intended to be or have been recycled, reconditioned or reclaimed.
> 2.   A hostile fire means one which becomes uncontrollable or breaks out from where it was intended to be.

The London Insurers argue that since the claims of the 21 MC 100 litigation involve exposure to toxic chemicals and other pollutants, they must fall within this policy exclusion. The argument is without merit. The City and its contractors are sued, not for causing pollution, but under the Labor Law, because the City allegedly failed to provide proper equipment, or training in the use of such equipment, and did not assure the safety of the workplace. Policy exclusions are to be interpreted narrowly. The London Insurers must show that all claims in the underlying 21 MC 100 litigation fall within the policy exclusion. <u>Frontier Insulation Contractors Inc.</u>, 690 N.E.2d at 869 ("If any of the claims against the insured arguably arise from covered events, the insurer is required to defend the entire action.").

The London Insurers have not carried this burden. The claims asserted in the 21 MC 100 litigation allege that the City (1) knew that "the air and area in, around, on and at the World Trade Center site was polluted and contaminated with toxic hazardous substances", knew that "workers were exposed to enormous quantities of toxic, carcinogenic, mutagenic, teratogenic hazardous substances", and "knew that protection from hazardous substances was necessary for workers" but failed to share this information with the plaintiffs; (2) did not provide training or supervision of personal protective equipment and allowed damaged equipment to be used; and (3) deliberately concealed results of testing of the World Trade Center site which revealed "dangerously

high concentration of total volatile organic compounds, including but not limited to benzene, that far exceeded the protection limits provided by air purifying cartridge respirators and requiring, instead, supplied air and self-contained breathing apparatus (SCBA)." Amended Master Complaint Against the City of New York, 21 MC 100. The plaintiffs further allege that the contractors received information of workers becoming ill at the site but failed to act on this information and failed to ensure the proper safety training of its workers. Amended Master Complaint Against Construction Manager Defendants, 21 MC 100. It is clear, given the nature of these claims and the breadth of the duty to defend, that the London Insurers are unable to show that plaintiffs' claims fall wholly within the pollution exclusion. And because the London Insurers cannot show that all the claims fall within the pollution exclusion, the obligation to defend the City and its contractors is triggered with regard to the whole of the 21 MC 100 complaints. See Calvert Ins. Co. v. S&L Realty Corp., 926 F.Supp. 44 (S.D.N.Y. 1996) (Duty to defend landlord triggered against complaint alleging his negligence in failing to control and ventilate noxious fumes emanating from the installation of a new floor despite pollution exclusion clause); Schumann v. New York, 610 N.Y.S.2d 987, 989 (N.Y. Ct. Cl. 1994) (holding that pollution exclusion did not excuse insurer's duty to defend where plaintiff's claims included failure to provide appropriate protective device, because a reasonable possibility existed that the insured would be held liable for some act or omission within the policy).

The City and its contractors responded to a national tragedy. In the aftermath of September 11, thousands of workers came to the WTC site to assist in the rescue effort and to clear the area of the crushing amounts of debris from the collapsed

twin towers. They sue the City, not because it failed to abate the pollution resulting from the collapse of the Twin Towers, but because, they allege, the City negligently failed to protect them from the harms present at the World Trade Center site. The cases cited by the London Insurers are not persuasive. None of those cases concern an insured's duty to safeguard the workplace. They are classic cases of nuisance; they are claims of damage by adjacent property owners due to an insured's failure to abate or contain toxins. See, e.g., Town of Harrison v. Nat'l Union Fire Ins. Co., 675 N.E.2d 829 (N.Y. 1996) (pollution exclusion applied where insured was sued by owners of adjacent properties alleging failure to abate disposal of toxic waste onto adjacent property during excavation effort); Denihan Ownership Co., LLC v. Commerce & Indus. Ins. Co., 37 A.D.3d 314 (N.Y. App. Div. 2007) (same; pollution exclusion applied where insurer had paid claim and extra contamination was later found on site).

The London Insurers issued their policies in October 2001 and January 2002, after September 11, 2001. Although all risks may not then have been evident, enough was known by the underwriters to enable them to write specific exclusions if, indeed, they truly intended to exclude specified risks and, particularly, the claims that were by then beginning to be filed in the lawsuits consolidated as the 21 MC 100 litigation. The London Insurers failed to write such a specific exclusion. They cannot now ask the court to remedy their failure. The inability of the London Insurers to show that the "exclusion is subject to no other reasonable interpretation, and that there is no possible legal or factual basis upon which the insurer may eventually be required to indemnify the insured," Frontier Insulation Contractors, Inc., 690 N.E.2d at 868-69, requires them to defend their insureds.

15

At argument, the London Insurers attempted to identify certain classes of claims in the 21 MC 100 litigation that would fall within the policy. Their effort is beside the point. This case is not about the ultimate duty to pay; it is about the duty to defend. The duty to defend is broad, and if the duty is triggered by any of the claims, as it clearly is here, the London Insurers must defend against all of the claims. See Ogden Corp. v. Travelers Indem. Co., 924 F.2d 39, 41 (2d Cir. 1991) (to be relieved of duty to defend, insurer must show that the "allegations of the complaint cast that pleading solely and entirely within the policy exclusions, and, further, that the allegations, *in toto*, are subject to no other interpretation") (quoting Technicon Elecs. Corp. v. Am. Home Assurance Co., 542 N.E.2d 1048, 1050 (N.Y. 1989)).[4]

III. The London Insurers' Defense of Inadequate Notice Fails.

The London Insurers argue that summary judgment is inappropriate at this stage because material issues of fact are present in this case—most notably, the issue of whether the London Insurers were provided with timely notice of the claims filed in the underlying 21 MC 100 litigation and of their alleged duty to defend and indemnify those claims. I hold that notice was adequate, and that no triable issues of fact are presented. The London Insurers argued in their papers that they did not receive notice of the 21 MC 100 litigation from the WTC Captive until August 2006. At argument, however, the London Insurers acknowledged that they received notice of the litigation a year-and-a-half earlier, in January 2005, from Turner Casualty & Surety on behalf of Turner

---

[4] In its moving brief, the WTC Captive argued that neither (1) the "known occurrence" exclusion—excluding from coverage an occurrence of which the insured was aware or should have been aware prior to October 3, 2001—nor (2) the asbestos exclusion contained in the London Insurers' Policies, operated to excuse the London Insurers' duty to defend. The London Insurers did not address these arguments in their brief, and therefore have conceded that these exclusions do not excuse their duty to defend in the 21 MC 100 litigation. And even if the London Insurers had argued that these exclusions applied, I note that, upon my independent review of these exclusions, they do not apply to the claims in the 21 MC 100 litigation.

16

Construction Company. The City gave its first notice to the London Insurers in October 2002. Pursuant to Endorsement No. 13 of the policy and custom and usage, it sent its notice to Willis, the broker for the London Insurers and, as well, the placement broker for the City in procuring the insurance. Notice to the broker constitutes notice to the insurer for which it acts. 1 Barry R. Ostrager & Thomas R. Newman, Handbook on Insurance Coverage Disputes § 4.02(d) (Aspen Publishers 13th ed. 2006) ("The insured can, of course, satisfy the notice requirement by providing notice to an authorized agent of the insurer.").[5]

The London Insurers, inexplicably, claim not to have received the notice. Equally inexplicably, the London Insurers could not tell me with any reliability that Willis had or had not transmitted the notices to the London Insurers. The London Insurers also argue that the City's notice to Willis was insufficient, because Endorsement No. 24 to the policy provided that notice should be given both to Willis, the broker, and to the attorneys of the London Insurers, Wilson, Elser, Moskowitz, Edelman & Dicker..

I am not persuaded by the Excess Insurers' arguments. I rule that the notice provided by the insureds to Willis of the claims in the 21 MC 100 litigation, with instruction to forward the claims onto the insurers, was adequate notice.[6] Clearly and admittedly, the London Insurers were already on notice, for they admit that they had received the notice given by Turner in January 2005, a point in time before 97 percent of the claims now pending in the 21 MC 100 litigation had been filed. Given the extensive

---

[5] The City's notice read, "Please promptly transmit this entire set of Notices to all insurers participating in the World Trade Center Coordinated Insurance Program, and advise me of the date it is transmitted".

[6] If, as the London Insurers hypothesized at argument, Willis failed to transmit the notices from the insured of the claims because Willis believed that the London Insurers' policies were not triggered, the London Insurers may have a cause of action against Willis, but Willis' possible failure to transmit the notice has no bearing on my ruling on the adequacy of the notice.

press coverage of everything related to 9/11, it is incredible for the London Insurers to argue that they were unaware of their duty to defend until WTC Captive's notice, in August 2006. Indeed, that was the time when the London Insurers' duty to defend was triggered, for the underlying Liberty Mutual policy became exhausted just two months earlier, on June 5, 2006, with notice being provided to the London Insurers two days later, on June 7, 2006. By then, the London Insurers were well aware of the litigation and of their obligation to defend the City and its contractors. I hold that the London Insurers cannot evade their obligation by complaining about notice.

IV. <u>The London Insurers' Right To Sue Other Insurance Companies for Indemnification at a Later Date Is Preserved.</u>

The London Insurers raise a concern that although they are primary to the excess policy of WTC Captive, the WTC Captive is primary to the contractors' insurance.[7] In consequence, the London Insurers argue, they may have recourse for defense costs they advance against the contractors' insurance. The relevant provision of the WTC Captive insurance policy provides as follows: "the Company [WTC Captive] will only be liable in excess of Underlying Insurance Amounts under valid Underlying Policies." The Underlying Policies are set forth in Schedule 2 of the WTC Policy and include the Liberty Mutual and London Insurers' policies, as well as other policies.

The insurance coverage held by the contractors and subcontractors that were engaged in the clean-up effort is in the process of being produced in the 21 MC 100 litigation, and provisions of confidentiality have not yet been settled. Consequently, I do not have sufficient information to rule on the concern raised by the London Insurers, even

---

[7] WTC Captive represented that the City has no insurance other than the Liberty Mutual, London Insurers and WTC Captive policies.

18

had I wanted to do so. The issue is not fairly raised by the complaint or summary judgment motion of WTC Captive, and I decline to respond to the concern expressed by the London Insurers. Whether they have recourse against other insurance carriers is an issue for the future. The concern has no relevance to this case, and it does not affect my ruling that the London Insurers have a duty to defend the City and its contractors in the underlying litigation, from the date of notice to the London Insurers that the underlying Liberty Mutual policy was exhausted, and thereafter until their policies are exhausted.

## Conclusion

For the reasons stated, I grant WTC Captive's motion for partial summary judgment and deny the London Insurers' cross-motion for summary judgment. The parties will meet with me at conference on May 23, 2008, 9:30 a.m., or represent in a joint letter to me before then: (1) whether they have reduced the amount owed by the London Insurers to WTC Captive to a fixed sum, and the amount of that sum; (2) if not, what further proceedings should be had; (3) whether WTC Captive wishes to proceed with, or withdraw, the second count of its complaint, alleging breach of fiduciary duty; and (4) such other matters as either party wishes to raise.

SO ORDERED.

Dated: April 15, 2008
New York, New York

ALVIN K. HELLERSTEIN
United States District Judge

19